UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARITES VOCES, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-525 |
| | § | |
| ENERGY RESOURCE TECHNOLOGY, | § | |
| G.O.M., L.L.C., *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court are Defendants Talos Energy, LLC and Energy Resource Technology GOM, LLC's Amended Motion for Summary Judgment Seeking Dismissal of All Claims Asserted by Plaintiffs (Doc. #50), Plaintiffs' Response (Doc. #55-2), and Defendants' Reply (Doc. #61). Having considered the arguments and the applicable law, the Court grants Defendants' Motion.

**I. Background**

This case arises from the death of a welder, Peter Voces, on an oil platform in the Gulf of Mexico. Voces drowned after the catwalk upon which he was standing separated from an oil platform and fell into the Gulf. Doc. #55-2 at 1.

The Platform, Vermillion Block 200 Platform "A," was owned by Defendant Energy Resource Technology GOM, LLC ("ERT"). *Id.* ERT is a subsidiary of Talos Energy, LLC ("Talos"). *Id.* The Platform had been decommissioned, and ERT hired Offshore Specialty Fabricators, LLC ("OSF") to remove it. Doc. #50 at 1-2. The decedent Peter Voces worked for OSF, which specializes in the removal of decommissioned oil and gas platforms from the Gulf of Mexico. *Id.* ERT paid OSF $4,316,235 to remove the Platform. *Id.* It had hired OSF nineteen

times in the past for similar operations. *Id.* ERT hired OSF as an independent contractor, and their agreement provided that

> 5. (a) in the performance of any Work for Company, Contractor conclusively shall be deemed an independent contractor, with the authority and right to direct and control all of the details of the Work, Company being interested only in the result obtained, but all Work contemplated shall meet the approval of Company and shall be subject to Company's general right of inspection; (b) the employees, agents and representatives of Contractor at all times shall be under the direct and sole supervision and control of Contract; and (c) no relationship of master and servant or of principal and agent shall exist between Company on the one hand and Contractor or any employee, agent or representative of Contractor on the other hand.

Doc. #50 at 2. Under the contract, OSF was responsible for planning, managing, and supervising all of the removal work. *Id.* at 3.

On October 26, 2013, OSF's derrick barge *Kallop* arrived at the Platform to begin the removal. Doc. #55-2 at 2. Because the Platform was a large one, the removal was planned as a series of "lifts." *Id.* Sections of the Platform would be removed piecemeal and lifted by crane to a barge, where they could then be transported to the shore. *Id.* OSF's Barge Superintendent Captain Joe Douglas was responsible for the operation. Doc. #50 at 3. Also aboard was a company man from ERT, Person-In-Charge Ken Goyins. Doc. #55-2 at 2.

On October 27, OSF began the removal process. Doc. #50 at 4. Originally, OSF had planned to start by lifting two vent booms (a type of crane) from a 5,000 barrel tank known as ABJ332. *Id.* at 3. But due to high seas, OSF's Captain Douglas delayed lifting the vent booms. Doc. #55-2 at 4; Doc. #50 at 4. Instead, Douglas directed the OSF crew to prepare the tank itself for removal. *Id.* ERT's Goyins agreed to this change in the order of operations. *Id.* As part of the prep work, OSF welders would cut the welds holding the tank to the Platform. *Id.*

OSF has a standing rule that no more than 50% of the welds holding a piece of equipment—like the tank—to the Platform can be cut unless the equipment is hooked up to a

crane. Doc. #50 at 4. This is an industry-wide standard known as the "50% rule." *Id.* But during the removal operation, OSF failed to follow the 50% rule.

Cutting the welds to the tank took two twelve-hour shifts. Doc. #55-2 at 4. OSF foreman Nathaniel Meredith supervised the first shift, which ran from midnight to noon. Doc. #50 at 4. OSF foreman Jason LeBoeuf supervised the second shift, which ran from noon to midnight. *Id.* At some point, there was a miscommunication about which welds were to be cut. During the first shift, Meredith's welding crew cut 50% of the welds holding the tank to the Platform. Doc. #50 at 5. LeBoeuf's second-shift crew apparently did not realize this. *Id.* The result was that by the time that Peter Voces cut the catwalk to the ABJ332 tank, all of the other welds had already been cut, and the tank separated from the north side of the platform and plunged into the sea, taking Voces with it. *Id.*; Doc. #50 at 4-5. The incident was later investigated over the course of a year by a six-member panel of the Bureau of Environmental Safety and Enforcement ("BSEE"). Doc. #55-2 at 5.[1] In this action, the Plaintiffs are Voces' wife Marites P. Voces, individually and on behalf of the estate of Peter Voces, and as next friend of their minor children, J. V., M. J. V., M. P. V., and P. V. Plaintiffs are citizens of the Republic of the Philippines. They seek to recover against ERT and Talos for Voces' death.[2]

## II. Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the

---

[1] *See* Bureau of Saftey and Environmental Enforcement, *Investigation of October 27, 2013, Fatality Vermilion Area Block 200 Platform "A" Lease No. OCS-G 09500, Complex ID No. 24098-01* (2014), *available at* http://www.bsee.gov/uploadedFiles/BSEE/Enforcement/Accidents_and_Incidents/Panel_Investigation_Reports/VR200%20Report%20-%20Response%20Memo%20(2).pdf.

[2] In this action, Plaintiffs sued both ERT and Talos, but they do not indicate why Talos should be liable for the actions of its subsidiary ERT. Most of Plaintiffs' arguments refer to ERT only (*see* Doc. #55-2). In any case, the parent-subsidiary relationship between ERT and Talos does not alter the Court's analysis of the legal issues.

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56 burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540

(quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**III. Analysis**

As an initial matter, ERT's platform was located on the outer Continental Shelf off the Louisiana coast. The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* (OCSLA) mandates that when disputes arise involving fixed structures erected on the outer Continental Shelf, applicable laws of the adjacent state will be applied to the extent not inconsistent with other federal laws and regulations. *Coulter v. Texaco, Inc.*, 117 F.3d 909, 911 (5th Cir. 1997) (footnote omitted). Accordingly, the Court will apply Louisiana law to this case.

Plaintiffs advance two arguments in favor of Defendants' liability for Voces' death. First, Plaintiffs argue that ERT is liable for the actions of its independent contractor OSF under Louisiana Civil Code Article 2315. Second, Plaintiffs argue that ERT is liable as a custodian of the Platform under Louisiana Civil Code Article 2317.1. Plaintiffs also argue that the BSEE's regulations are relevant in assessing Defendants' standard of conduct and that punitive damages should be imposed on Defendants.

**A. ERT's Liability For The Actions Of Its Independent Contractor, OSF**

A principal cannot be held liable for injuries resulting from the negligence of an independent contractor like OSF unless (1) the liability arises from ultrahazardous activities performed by the contractor on behalf of the principal or (2) the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts. *Coulter*, 117 F.3d at 912 (footnote omitted). Plaintiffs do not contend that the Platform removal in this case was ultrahazardous. Therefore, the question is whether Defendants retained control over or

authorized any of OSF's activities that led to Voces' death. *Id.*

The operational control exception requires the Court to examine whether and to what extent the right to control work has been contractually reserved by the principal. *Id.* (citing *Graham v. Amoco Oil Co.*, 21 F.3d 643, 646 (5th Cir. 1994); *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir. 1987)). Here, as is common between platform owners and independent drilling contractors, the contract between ERT and OSF grants OSF the "authority and right to direct and control all the details of the Work." Doc. #50 at 3. That means that OSF, not ERT, had operational control of the Platform removal. *See Coulter*, 117 F.3d at 912; *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 193 (5th Cir. 1991) (concluding that a similar contract did not render platform owner liable for independent contractor's negligence).

In addition, the fact that a principal like ERT stations a "company man" on the platform who observes the independent contractor's activities, can make safety recommendations, and must report unsafe work practices or conditions to his superiors does not establish operational control. *Coulter*, 117 F.3d at 912 (citing *Graham*, 21 F.3d at 646) (presence of company man who observed unsafe working conditions created by unloading of excess amounts of casing and who did not stop operation did not amount to operational control or implicit authorization of those unsafe conditions that led to injury); *Ainsworth*, 829 F.2d at 550. As one court put it,

> [t]o create a duty based on plaintiff's claim that Chevron "examin[ed] its contractor's work place, procedures and equipment for safety concerns" would amount to an end-run around a large body of Fifth Circuit precedent finding no "operational control" despite some knowledge of risk or involvement with safety issues and the presence of "company men" on the contractor's rig. *See, e.g., Duplantis*, 948 F.2d at 193 (no duty despite holding safety meetings and having role in firing of contractor employee for safety violations); *Boutwell*, 864 F.2d at 408 (no duty to stop contractor from working around hole in deck); *Ainsworth*, 829 F.2d at 551 (no duty despite company man's knowledge that contractor was working without lights). As the *Duplantis* court held, "[t]he fact that a principal takes an active interest in the safety of the employees of its independent

contractor does not, in and of itself, constitute direct operational control." *Duplantis*, 948 F.2d at 193.

*Dupre v. Chevron U.S.A. Inc.*, 913 F. Supp. 473, 483 (E.D. La. 1996) *aff'd*, 109 F.3d 230 (5th Cir. 1997).

However, there are cases in which the actions of a company man can establish liability of the principal. *See, e.g., Texas E. Transmission Corp. v. McMoRan Offshore Expl. Co.*, 877 F.2d 1214, 1222 (5th Cir. 1989) (finding principal liable for offshore independent drilling contractor's negligence where company man intervened in rig relocation operation, thus assuming ultimate authority over it, and had as much information as anyone else concerning the circumstances of the accident); *Crane v. Exxon Corp., U.S.A.*, 613 So. 2d 214, 221 (La. Ct. App. 1992) (holding principal liable for independent contractor's actions where oil company representative assumed the task of monitoring safety violations and personally reprimanded members of the contractor's crew for violations). These cases appear to involve a company man assuming some active role in the operation.

In this case, OSF had total operational control over the Platform removal. OSF provided its own complete, final, and detailed job procedure for the removal, including engineering calculations. Doc. #50 at 3. OSF's Barge Superintendent Captain Joe Douglas was responsible for the operation, including the sequencing of activities and decisions related to weather. *Id.* The removal was supervised by OSF's shift foremen Nathaniel Meredith and Jason Leboeuf. *Id.* at 3-5. The mere fact that ERT stationed a company man—Person-In-Charge Ken Goyins—on the Platform during the removal operation does not render ERT liable for OSF's actions.

Nonetheless, Plaintiffs attempt to show that ERT retained operational control over OSF in several ways. First, Plaintiffs argue that ERT assumed the responsibility of ensuring the work plan was safe and properly communicated to OSF employees. The basis for this argument is the

following statement by ERT Vice President Chuck Jones to the United States Department of the Interior and the BSEE:

> Goyins's responsibility was to ensure that OSF's work plan was safe and that the work plan had been properly communicated to all OSF employees.

Doc. #55-2 at 16. But Plaintiff left out the rest of the quote. It continues:

> The work plan presented to Mr. Goyins was safe, as it included a safe plan for the removal of the vent booms and the inclusion of the 50% cut limit. It is also undisputable that, as far as Mr. Goyins could possibly have known, OSF had properly communicated the Work Plan to all of its employees, which OSF confirmed to Mr. Goyins.

Doc. #61 at 4 n.15. Presented in full, the quote indicates that Goyins discharged his responsibility.

Second, Plaintiffs point out that Goyins failed to attend a safety walkthrough after arriving at the platform. But "the fact that [the owner] periodically inspected the jobsite"—such as with a walkthrough—"does not constitute the exercise of operational control." *Boutwell v. Chevron U.S.A., Inc.*, 864 F.2d 406, 408 (5th Cir. 1989) (citing *Ainsworth*, 829 F.2d at 550). So regardless of whether Goyins attended the walkthrough, OSF was still running the show. And even if Goyins had inspected the area prior to welding, it is unlikely that he would have spotted this hazard, since it arose after welding began—namely, when over 50% of the welds were cut during the operation.

Finally, Plaintiffs argue that Goyins authorized the change in the order of operations that led to the welds being cut before the vent booms were removed. But the decision to cut the welds first was made by Douglas, who had control over sequencing and weather decisions. And the accident was not caused by a change in the order of operations. It was caused by OSF's failure to follow the 50% rule. Accordingly, Defendants are not liable for the actions of independent contractor OSF. As the *Dupre* court observed, there is "no practical difference between

plaintiff's claim that [ERT] acquired a duty by virtue of involving itself with safety and those cases in which the Fifth Circuit analyzed whether the platform owner's knowledge of risks or role in safety operations created a duty so that it could be vicariously liable for the negligence of its independent contractor." 913 F. Supp. at 483.

### B. ERT's Liability As A Custodian Under Louisiana Civil Code Article 2317.1

Plaintiffs also argue that ERT is liable as a custodian of the Platform under Louisiana Civil Code Article 2317.1 because removing the welds from the tank created a hazardous condition and defect on the Platform.

Louisiana Civil Code article 2317 provides as follows:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.

And Louisiana Civil Code article 2317.1 [a modification to article 2317] provides:

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

Under Louisiana law, to prove a claim of negligence caused by the ruin, vice or defect of a thing, a plaintiff must show: (1) the property which caused the damage was in the "custody" of the defendant; (2) the property had a condition that created an unreasonable risk of harm to persons on the premises; (3) the unreasonably dangerous condition was a cause-in-fact of the resulting injury; and (4) defendant had actual or constructive knowledge of the risk.[3] *Girard v.*

---

[3] Prior to 1996, Louisiana imposed strict liability upon owners whose "things" caused harm to others. *Girard*, 2008 WL 2127908 at *5 n.4. But that is no longer the case. *See id.*; *Laysone v.*

*Brandt Energy Envtl.*, No. CIV. A. 06-1884, 2008 WL 2127908, at *3-4 (W.D. La. May 19, 2008) (footnotes and citations omitted).

But an owner is not liable under Article 2317.1 where the injury is not caused by the structure itself, but rather by the unsafe manner in which the contractor performed his work. *See Boutwell*, 864 F.2d at 409 (oil and gas platform owner not liable where contract employee fell into unbarricaded hole in platform because "it was not the platform or hole which caused [the worker's] injury, but the negligent way in which [contractor] marked their construction related holes."); *Stine v. Creel*, 417 So.2d 1243, 1246 (La. App. 1st Cir. 1982) (independent roofing contractor not entitled to relief because "[t]he roof . . . does not constitute a defective thing that caused injury to Stine. Again, it was not the roof that caused the injury—it was the manner about which Stine sought to remove it that caused the injury."); *O'Neal v. Int'l Paper Co.*, 715 F.2d 199, 202 (5th Cir. 1983) ("O'Neal's injuries resulted from the method used to cut apart the boiler, not from a defect in the boiler or its components.").

Here, as in the above-cited cases, it was not a defect on the Platform which caused Voces' death. Instead, it was the manner in which OSF removed the welds without following the 50% rule that caused his death. Accordingly, ERT is not liable under Article 2317.1.

### C. Federal Regulations

Plaintiffs argue that the BSEE's regulations are relevant evidence of ERT's standard of conduct in this case. But regardless of whether that is true, those regulations do not create a duty on the part of ERT to OSF's employees. *See Dupre*, 913 F. Supp. at 481 ("while MMS regulations may be used as evidence in weighing a defendant's culpability, the Fifth Circuit has

---

*Kansas City Southern Railroad*, 786 So.2d 682, 689 n.9 (La. 4/3/01) ("By requiring knowledge or constructive knowledge . . . the legislature effectively eliminated strict liability under Article 2317, turning it into a negligence claim.").

held that "there is no implied cause of action from the mere breach of MMS regulations.") (citing *Romero v. Mobil Exploration and Producing N.A., Inc.*, 939 F.2d 307, 311 (5th Cir. 1991).[4] Because the Court grants summary judgment to Defendant on all claims, it will not reach the relevance of the BSEE regulations.

### D. Punitive Damages

Plaintiffs assert that they are entitled to punitive damages in this case. But because the Court grants summary judgment to Defendants on all claims, it will not reach the issue of punitive damages either.

## IV. Conclusion

For the foregoing reasons, Defendants' Amended Motion for Summary Judgment (Doc. #50) is GRANTED.

It is so ORDERED.

FEB 1 8 2016
_____
Date

_____
THE HONORABLE ALFRED H. BENNETT
UNITED STATES DISTRICT JUDGE

---

[4] The BSEE was formerly the Mineral Management Service ("MMS").